IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SEWICKLEY VALLEY HOSPITAL and ) <br> THE MEDICAL CENTER, BEAVER, PA, ) <br>     Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> MICHAEL O. LEAVITT, as the Secretary ) <br> of the United States Department of Health ) <br> and Human Services, ) <br>     Defendant. ) | Civil Action No. 07-869 <br> Chief Judge Ambrose <br> Magistrate Judge Mitchell |

REPORT AND RECOMMENDATION

I.     Recommendation

It is respectfully recommended that the motion for summary judgment submitted on behalf of Plaintiffs (Docket No. 16) be denied. It is further recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 20) be granted.

II.     Report

Plaintiffs, Sewickley Valley Hospital ("SVH") and The Medical Center, Beaver, PA ("TMC"), bring this action pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 551-59 (APA), and the applicable provisions of the Medicare Act and regulations, 42 U.S.C. § 1395*oo*f(1), 42 C.F.R. § 405.1877, seeking review of the final decision of the Defendant, Michael O. Leavitt, Secretary of Health and Human Services ("Secretary"), denying their Medicare reimbursement claims for depreciation-related losses that allegedly occurred during the statutory consolidation of SVH and TMC to form Valley Medical Facilities ("VMF"), which occurred on November 1, 1996 (the "Consolidation Date").

Presently before this Court for disposition are cross-motions for summary judgment. For

the reasons that follow, Plaintiffs' motion should be denied and Defendant's motion should be granted.

Facts

Prior to the transaction at issue in this case, SVH and TMC were both Pennsylvania non-profit corporations operating acute care inpatient hospitals. TMC's parent company was Consolidated Healthcare Services ("CHS"), also a Pennsylvania non-profit corporation. (Administrative Record ("A.R.") 1042.)[1] On April 30, 1996, CHS, SVH and TMC executed an Agreement of Consolidation, which was amended on October 29, 1996. The agreement contemplated the entry through consolidation of TMC and SVH into the yet-to-be-formed corporation VMF, for which the sole corporate member (i.e., the equivalent of sole shareholder in a stock corporation) would be Valley Health System ("VHS"). (A.R. 261-323, 1042.) Prior to the effective date of the statutory consolidation, November 1, 1996, VMF did not exist and had no board of directors or corporate officers. (A.R. 1043.)

The parties have stipulated that, prior to the Consolidation Date, TMC, SVH and VMF did not have common ownership, common officers or common board members and that CHS/TMC and SVH were not related entities and neither were parties to any shared services agreement nor was either a member or party to the same health care delivery system, but all were separate not-for-profit corporations. (A.R. 1043.) The board of directors and officers of VHS and VMF were identified in the exhibits to the agreement, as amended, but did not take office and had no authority or control over VHS or VMF until the Consolidation Date.

Both TMC and SVH were approved providers participating in the Medicare and Medicaid

---

[1] Docket No. 13.

programs and were in compliance with the conditions of participation in those programs and the provider contracts with these programs. Following the closing on October 31, 1996, VMF, the newly-formed corporation resulting from the statutory consolidation, succeeded by operation of law to and assumed all rights and obligations of TMC and SVH under the Non-Profit Corporation Law of Pennsylvania. (A.R. 1043-44.)

On the Consolidation Date, the assets, liabilities, reserves and accounts of each of TMC and SVH were taken upon the books of VMF at the amounts they were being carried on the books of TMC and SVH immediately prior to the closing, subject to any adjustments which were required in accordance with generally accepted accounting principles giving effect to the Consolidation Date. TMC, CHS and SVH were represented by counsel in the negotiations. The parties commenced their negotiations in or about November 1995, culminating in final approvals of the consolidations at board meetings held on October 29, 1996. Thus, CHS/TMC and SVH independently negotiated the agreement for over a year. (A.R. 1044.) The parties have stipulated that the consolidation was done pursuant to and in conformity with Pennsylvania law. (A.R. 1046.) SVH and TMC ceased to exist as of the Consolidation Date. (A.R. 198.)

According to the terms of the consolidation agreement, the board of directors of the new corporation, VMF, was to have 20 members, 6 of whom were members of the SVH board, 6 of whom were members of the CHS board, 6 to be jointly chosen from the community by TMC and CHS, and the remaining two were ex-officio members of CHS's board. (A.R. 23-24.) Similarly, the presidents and chief financial officers of both SVH and TMC remained in place in the new organization and continued to run their respective hospitals.

Reverend Crowell, the president and CEO of TMC and CHS, testified at the

administrative hearing in this case that the consolidation was intended to promote the interests of TMC and SVH in community-based healthcare and that neither TMC or SVH ever considered purchasing the other. (A.R. 134; see also A.R. 951 ("The plan of consolidation and its implementation on the effect date were carried out in good faith so as to achieve the objectives for the respective communities which were served by SVH and TMC.").). Rather, the consolidation was intended to be a combination of equals. The Chief Executive Officer of SVH stated in his declaration:

> Because of the fact that those who were involved in the negotiation of and approval of the proposed consolidation maintained the business judgment view that this was to be a transaction that resulted in a combination of equals, there was never any discussion of having one institution purchase the other.

(A.R. 951.)

Consequently, neither TMC nor SVH ever considered whether or not the liabilities that were to be assumed by the post consolidation entity accurately reflected the fair market value of SVH or TMC. When asked if there had been an evaluation to see whether the liabilities of SVH and TMC reflected their fair market values, Rev. Crowell testified that "we weren't looking to put it on the market." Consequently, no appraisal was done of the assets of TMC or SVH until after the consolidation. (A.R. 740-848; 390-495.)

In accordance with the consolidation agreement, the assets and liabilities of SVH and TMC were assumed by VMF. According to the provider's calculation of the loss, at the time of the consolidation, TMC's "Total current and Cash Based Assets" was $121,740,532. (A.R. 851-52.) At the same time, its debt amounted to $93,285,563. Thus, TMC's monetary assets exceeded its liabilities by $28,454,969. After the consolidation, Valuation Counselors Inc. appraised the "business enterprise value" of TMC to be $125,387,000. (A.R. 741-42.) This

4

appraisal did not include the value of TMC's cash and current assets noted above. (A.R. 851.) Nevertheless, the amount exceeded TMC's debt by $32,101,437.

Similarly, VMF assumed both SVH's assets and its liabilities as part of the consolidation. According to the provider's calculation of the loss, at the time of the consolidation, SVH's monetary assets totaled $46,803,000, while its liabilities were approximately $27 million. (A.R. 386.) Thus, SVH's monetary assets alone exceeded its liabilities by $19 million. After the consolidation, Valuation Counselors appraised the "business enterprise value" of SVH to be $107,336,000 (not including cash). (A.R. 392.)

Plaintiffs assert that, as a result of the consolidation, losses on the sale of assets were realized for which they were entitled to Medicare reimbursement in the amount of $9,283,094 for SVH and $9,695,196 for TMC, for a total of $18,978,290. (Compl. ¶ 30.) Following the Consolidation Date, Plaintiffs filed "terminating" cost reports with Medicare for the fiscal year that ended on October 31, 1996.

Veritus Medicare Services, the fiscal intermediary ("FI"), audited Plaintiffs' closing cost reports and, by letters dated December 30, 1998 and January 18, 1999, respectively, notified TMC and SVH that it was disallowing their claimed losses. (A.R. 1193-96, 1417-20.) VMF, the successor in interest to both SVH and TMC's loss claims, appealed the FI's decision to the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395*oo*(a). On March 15, 2005, the PRRB held a hearing, at which Plaintiffs submitted testimony from Reverend Crowell, Michael Maher and Robert DeLuca and submitted an affidavit by Donald Spalding; the FI presented the testimony of David Cipollone, Audit Supervisor at Veritus Medicare Services. (A.R. 115-211, 945-52.) On February 21, 2007, the PRRB issued a decision in SVH's favor but

5

held that TMC's claimed loss should be denied because TMC and CHS/VHS were related parties. (A.R. 56-70.)

The CMS Administrator, on behalf of the Secretary, reviewed the PRRB's decision. On April 23, 2007, the Administrator issued an opinion reversing the PRRB's decision with respect to SVH. The Administrator affirmed but modified the PRRB's decision with respect to TMC, holding that both claimed losses were prohibited by the bona fide sale rule as well as the related parties rule applied by the PRRB. (A.R. 2-32.) 42 U.S.C. § 1395*oo*(f)(1). The Administrator found that the discrepancy between the value of the transferred assets and the consideration received for them (i.e. each hospital had more in cash than in debt) provided substantial evidence that there was no bona fide sale in this case. The Administrator also agreed with the PRRB that TMC's transaction could not qualify for a loss due to the related party rules in light of TMC's relationship with VMF and its relationship with CHS/VHS. The Administrator further concluded that SVH's significant participation in the governance of VMF (the approval of a majority of the new board of directors and the retention of a significant number of corporate officers) rendered them "related parties," thereby disallowing the use of the "sale price" as the fair market value of the hospital. (A.R. 25.) The Administrator's decision became the final decision of the Secretary.

Procedural History

Plaintiffs filed this action on June 22, 2007. On November 15, 2007, Defendant filed an answer to the complaint and a certified copy of the transcript of the administrative record of the proceedings in this case (Docket No. 13). On January 31, 2008, Plaintiffs filed a motion for summary judgment. On March 17, 2008, Defendant filed a motion for summary judgment.

Standards of Review

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Under the Social Security Act, judicial review of a final administrative decision is governed by the APA, which provides for judicial review of agency decisions and is limited to "a determination of whether the agency action, findings and conclusions are arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law or unsupported by the evidence." 5 U.S.C. § 706(2)(A). The agency's decision must be supported by "substantial evidence," which is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mercy Home Health v. Leavitt, 436

F.3d 370, 380 (3d Cir. 2006) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). The burden of proof falls on the provider. <u>Id.</u>

With respect to Medicare regulations, the Supreme Court has held that courts:

> must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. This broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." <u>Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 697, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991).

<u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) (other citations omitted).

<u>Overview of the Regulations</u>

Under the Medicare Act, the Secretary reimburses hospitals for the reasonable cost of providing covered health care services to Medicare patients. 42 U.S.C. § 1395f(b)(2). Reasonable cost means "the cost actually incurred," excluding anything unnecessary for the efficient delivery of needed health services, and determined in accordance with the Secretary's regulations. 42 U.S.C. § 1395x(v)(1)(A).

The Secretary has promulgated extensive regulations for determining reasonable cost reimbursement. <u>Shalala v. Guernsey Mem. Hosp.</u>, 514 U.S. 87, 92 (1995). Among other things, an appropriate allowance for depreciation on buildings and equipment used in the provision of

patient care is an allowable cost. 42 C.F.R. § 413.134(a) (1995).[2] The portion of such depreciation expense borne by Medicare is based in part on the degree to which the assets have been used to serve Medicare beneficiaries.

Fair market value "is the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition. Usually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition." 42 C.F.R. § 413.134(b)(2). See also Provider Reimbursement Manual ("PRM"), Ch. 1, § 104.15 (A.R. 690).

The system of providing reimbursement for depreciable assets results in those assets having a "net book value" for Medicare purposes, which is typically the historical cost of the asset less depreciation previously paid to the provider. See 42 C.F.R. § 413.134(b)(9). Under the Secretary's regulations, when a hospital disposes of a depreciable asset for more or less than its net book value, "an adjustment is necessary in the provider's allowable cost ." § 413.134(f). For example, when an asset is sold for more than book value, the provider is considered to have incurred a gain on the asset, and the Secretary can "recapture" from this gain depreciation payments previously made. Conversely, if the provider sells the asset for less than book value, the provider is considered to have incurred a loss, and the Secretary provides additional reimbursement to the provider. See 44 Fed. Reg. 3980 (1979) ("[I]f a gain or loss is realized from the disposition, reimbursement for depreciation must be adjusted so that Medicare pays the

---

[2] In 1997, Congress amended section 1861 of the Social Security Act, 42 U.S.C. § 1395x(v)(1)(O)(i), by setting the asset's value equal to the owner's historical cost less depreciation allowed, thereby eliminating the possibility of gains or losses resulting from asset disposals after August 5, 1997. However, this amendment did not affect the consolidation in this case, which had an effective date of November 1, 1996.

9

actual cost the provider incurred in using the asset for patient care."); 42 U.S.C. § 1395x(v)(1)(A) (1995) (the Secretary shall provide for suitable retroactive corrective adjustments where the aggregate reimbursement produced by methods of determining costs proves to be either inadequate or excessive).

The primary regulation at issue here is 42 C.F.R. § 413.134 (1995), concerning "allowance for depreciation based on asset costs." A subsection of the regulation dealing specifically with gains and losses upon disposal of depreciable assets provided in part that "depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft or other casualty." § 413.134(f)(1). If such disposal resulted in a gain or loss, "an adjustment is necessary in the provider's allowable cost." The treatment of the gain or loss "depends upon the manner of the disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section." Subsection (f)(2), entitled "Bona fide sale or scrapping," provided in part that gains and losses realized from "the bona fide sale" of depreciable assets were included in allowable costs while the provider is participating in Medicare.

The provision at the heart of the current dispute, § 413.134(*l*), was entitled "Transactions involving a provider's capital stock."[3] It addressed three particular types of transactions: (1) the acquisition of a provider's capital stock; (2) a statutory merger; and (3) a consolidation. The third subsection, on statutory consolidations, noted that a consolidation was a combination of two or more corporations resulting in the creation of a new corporate entity. § 413.134(*l*)(3). This subsection drew a distinction as to consolidations between unrelated parties and those between

---

[3] 42 C.F.R. § 413.134(*l*) was redesignated as 42 C.F.R. § 413.134(k) in 2002.

related parties. If the parties to the consolidation were unrelated (as defined in § 413.17), the assets of the provider corporation "may be revalued in accordance with paragraph (g) of this section," but if the consolidation is between two or more related corporations, no revaluation of provider assets is permitted. § 413.134(*l*)(3)(i-ii).

Section 413.17, referenced in subsection (*l*) above, was entitled "Cost to related organizations." It provided generally that "costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization," but are not to exceed the price of comparable such items that could be purchased elsewhere. 42 C.F.R. § 413.17(a). It also defined "related to the provider" to mean "that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies." § 413.17(b)(1). Further, "common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider," and "control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." § 413.17(b)(2) & (b)(3).

Plaintiffs' Arguments

Plaintiffs argue that: 1) the Administrator's interpretation of the term "between two or more corporations" in the regulation relating to gains and losses from consolidations as potentially referring to the pre-consolidation and post-consolidation entities is inconsistent with the unambiguous language of the regulation, which can only refer to the parties to the consolidation and cannot include the corporation that results therefrom, and thus the

11

Administrator's interpretation is not entitled to any deference; 2) the Administrator's new policy represents a fundamental change in CMS's previous interpretation of the regulations and a retroactive application, and such change can only be implemented after satisfaction of the notice and comment requirements of the APA, 5 U.S.C. § 553 (which did not occur), and the Administrator cannot rely on an unpublished policy to the detriment of providers who are unaware of it; 3) no substantial evidence exists in the record to support the Administrator's conclusion that CHS/VHS and TMC are "related parties" and conversely substantial evidence demonstrates that this is not the case; and 4) the Administrator erred in concluding that the transaction was not a bona fide sale because Medicare does not require cash as consideration and does not require that fair market value be paid.

<u>Defendant's Arguments</u>

Defendant argues that: 1) Plaintiffs may not claim a loss because the consolidation did not meet the criteria for a "bona fide sale"; and 2) Plaintiffs may not claim a loss because the consolidation was a "related party" transaction. Because Defendant's argument concerning the lack of a bona fide sale is availing, the Court need not address the alternative argument concerning whether the transaction involved related parties.

<u>Bona Fide Sale Requirement</u>

As explained above, Medicare regulations provide that:

Consolidation. A consolidation is the combination of two or more corporations resulting in the creation of a new corporate entity. If at least one of the original corporations is a provider, the effect of a consolidation upon Medicare reimbursement for the provider is as follows:

(i) Consolidation between unrelated parties. If the consolidation is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the provider corporation(s) may be revalued in accordance with paragraph (g) of this

12

section.

(ii) Consolidation between related parties. If the consolidation is between two or more related corporations (as specified in § 413.17), no revaluation of provider assets is permitted.

42 C.F.R. § 413.134(*l*)(3) (1995).

On October 19, 2000, CMS issued Program Memorandum ("PM") A-00-76 to its contractors, which addresses the issue of the recognition and reimbursement of depreciation-related losses on the sale of assets. The PM states that, because nonprofit entities have different motivations than for-profit entities, special considerations have to be regarded in applying the regulations to nonprofit mergers and consolidations. (A.R. 348.) The PM has two parts. First, it requires examination of whether members of the pre-consolidation hospital board of directors and management team continued in office after the consolidation, because if significant representation from the previous board or management team continues to exist in the new board or management team, no real change of control has occurred. Second, with respect the issue of bona fide sale, the PM provides that:

> Notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a <u>bona</u> <u>fide</u> sale as required by regulation 413.134(f) and as defined in the PRM at 104.24. The regulations at 42 CFR 413.134(*l*) do not permit recognition of a gain or loss resulting from the mere combining of multiple entities' assets and liabilities without regard to whether a <u>bona</u> <u>fide</u> sale occurred.
>
> ... for Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining. However, frequently this is not the environment that brings non-profit entities together through merger or consolidation.

13

> As with for-profit entities, in evaluating whether a <u>bona fide</u> sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis. As set forth in PRM 104.24, reasonable consideration is a required element of a <u>bona fide</u> sale. Thus, a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a <u>bona fide</u> sale. With regard to non-profit mergers or consolidations, often the sales price consists of assumed debt only, but may also include cash and/or new debt....
>
> Moreover, in analyzing whether a <u>bona fide</u> sale has occurred, a review of the allocation of the sales price among the assets sold is appropriate. In some situations, the "sales price" of the assets may be barely in excess of, or less than, the market value of the current assets sold, leaving a minimal, or no, part of the sales price to be allocated to the fixed (including the depreciable) assets. In such a circumstance, effectively the current assets have been sold, and the fixed assets have been given over at minimal or no cost. If a minimal or no portion of the sales price is allocated to the fixed (including the depreciable) assets a <u>bona fide</u> sale of those assets has not occurred....

(A.R. 349-50.)

Plaintiffs argue that Medicare regulations do not require arm's length bargaining or fair market value to generate a revaluation of assets affected by a corporate consolidation between unrelated parties and they contend that the Secretary's conclusion that the transaction was not bona fide is not supported by substantial evidence. Defendant responds that the consolidation did have to meet the requirements for a bona fide sale and that substantial evidence in the record supports the Secretary's conclusion that the transaction did not in this case.

As cited in the PM, the PRM states that:

> A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest.

PRM, Ch. 1, § 104.24 (A.R. 342).

Plaintiffs suggest that 42 C.F.R. § 413.134(*l*) creates a new rule under which transactions

14

that do not qualify under subsection (f) may nevertheless recognize gain or loss. Defendant observes that the Court of Appeals for the Tenth Circuit recently rejected this very argument:

> If, as the Secretary argues, any depreciation adjustment under § 413.134(*l*)(3)(i) must occur pursuant to § 413.134(f), and if, as St. Joseph [the provider] argues, the "bona fide sale" requirement is inapplicable to consolidations because they are not "sales," then St. Joseph automatically loses, because a consolidation would satisfy none of the other provisions of § 413.134(f) permitting a depreciation adjustment. The Secretary, however, is willing to allow depreciation adjustments in at least some consolidations, and the treatment of consolidations in the same vein as "sales" under § 413.134(f) is a reasonable way to accomplish that.

Via Christi Regional Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1275 n.14 (10th Cir. 2007).

Thus, the only way that Plaintiffs may recognize a loss is through a bona fide sale. Moreover, the court in Via Christi concluded that the Secretary's definition of "bona fide sale" to include arm's length bargaining and reasonable consideration is reasonable and entitled to deference:

> The "bona fide sale" requirement is a reasonable construction of 42 C.F.R. § 413.134(*l*)(3)(i), supported by the text of the regulations. Section 413.134(f) is the *only* section expressly permitting depreciation adjustments and defining the exact circumstances under which a provider can seek such an adjustment. Several other sections refer to it directly for this purpose. For instance, § 413.130 alludes to § 413.134(f) for determining any depreciation adjustments under the regulations: "Capital-related costs and an allowance for return on equity are limited to the following: (1) Net depreciation expense as determined under §§ 413.134, 413.144, and 413.149, *adjusted by gains and losses realized from the disposal of depreciable assets under § 413.134(f)*." 42 C.F.R. § 413.130(a) (emphasis added). Likewise, § 413.134(*l*)(2)(i) references § 413.134(f) as "concerning recovery of accelerated depreciation and the realization of gains and losses" in the statutory merger context. If the Secretary is going to construe § 413.134(*l*)(3)(i) as permitting depreciation adjustments for consolidations, then the Secretary is perfectly reasonable in maintaining consistency and only allowing depreciation adjustments that comply with § 413.134(f)....
>
> Compliance with § 413.134(f) is also consistent with interpretive materials that the Secretary issued both before and after the consolidation in the instant case....

15

> Of the disposals of depreciable assets listed in § 413.134(f), the only one that would apply here is the "bona fide sale" of § 413.134(f)(2), and the Secretary has reasonably interpreted it as applying in this case. The Secretary originally provided for depreciation adjustments under § 413.134(f) because the yearly "reasonable cost" depreciation reimbursements only approximated economic reality. See 44 Fed. Reg. at 3,980. In theory, at least, a "bona fide sale" under § 413.134(f) provided an objective measurement of an asset's worth, allowing both the Secretary and the provider to calculate the actual depreciation incurred to that point-and meriting an adjustment to previous depreciation payments. See id. Even if a consolidation or statutory merger is not a "sale" per se, treating it as a sale pursuant to § 413.134(f)(2) ensures that any depreciation adjustment will represent economic reality, rather than mere "paper losses."
>
> Additionally, the Secretary's definition of a "bona fide sale" in this context is reasonable and entitled to deference. In the instant case, the Secretary explained that a "bona fide sale" includes (1) "arm's length bargaining, [including] an attempt to maximize any sale price," and (2) reasonable consideration. This definition is consistent with the regulations and early interpretive materials. See 42 C.F.R. § 413.134(b)(2) (defining "fair market value" as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition," and explaining that "[u]sually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition"); Jan. 11, 1989, Memorandum; see also N. Iowa Med. Ctr. v. Dep't of Health & Human Servs., 196 F. Supp. 2d 784, 787 (N.D. Iowa 2002) ("Under 42 C.F.R. § 413.134(f), a sale of depreciable assets is bona fide if (a) fair market value is paid for the assets, and (b) the sale is negotiated (i) at arms' length (ii) between unrelated parties.")....

Id. at 1274-76 (footnotes and some citations omitted). See also Lehigh Valley Hosp.-Muhlenberg v. Leavitt, 253 Fed. Appx. 190, 194-95 (3d Cir. 2007) (even if PRRB relied on PM A-00-76 to determine what constitutes a bona fide sale in a non-profit context, such reliance was reasonable when it merely clarified an existing rule and explicitly stated that it did not include any new policies); Jeanes Hosp. v. Leavitt, 453 F. Supp. 2d 888, 903 (E.D. Pa. 2006) (same).

Plaintiffs point to testimony by their expert Michael Maher at the hearing that the Intermediary's focus on a disparity between purchase price and value was inconsistent with Medicare rules, which require only that a consolidation be between unrelated parties and that it

16

trigger a revaluation of assets under the laws of the state in which it occurred. (A.R. 152.) They further argue that even the Intermediary's witness, David Cipollone, testified that the regulations do not require bargaining or fair market value to generate a revaluation of assets affected by a corporate consolidation between unrelated parties and he admitted that he could not supply a reference to any rule or regulation in effect as of the Consolidation Date that stated that a consolidation must be a bona fide sale in order to qualify for reimbursement. (A.R. 197, 199, 207.)

Defendant responds that the meaning of regulations is a pure question of law and is not a proper subject for expert testimony, especially the testimony of experts retained as consultants to a provider and the Administrator properly gave no weight to it. In addition, it notes that this testimony cannot be reconciled with the plain language of 42 C.F.R. § 413.130(a), which expressly limits the recognition of gains and losses to the disposals of assets listed in § 413.134(f).

Courts which have addressed this issue have found that the Secretary's reliance on the Program Memorandum to clarify that a consolidation must meet the requirements of a bona fide sale in order to qualify for reimbursement is reasonable, is supported by the text of the regulations and is entitled to deference. Plaintiffs have cited no authority to the contrary. Thus, they have not demonstrated that the Secretary's interpretation is plainly erroneous or inconsistent with the regulation and therefore the Court must give it controlling weight. Therefore, the consolidation must have met the requirements of a bona fide sale or the loss will not be recognized.

In Via Christi, the court determined that substantial evidence justified the Secretary's

finding that no "bona fide sale" occurred:.

> reasonable consideration was notably absent from the transaction, and the economic case for revaluing the depreciable assets was highly questionable. In the "bona fide sale" context, the reasonable consideration inquiry involves determining whether the provider received fair market value for its assets. In the instant case, neither St. Joseph nor the Secretary conducted an appraisal of the assets' fair market value....

509 F.3d at 1276. The court declined to remand the case for a determination of fair market value because St. Joseph had the burden of showing that the transaction fit within § 413.134(f)'s bona fide sale provision and had failed to do so. In addition,

> no evidence suggests that a remand would change the result in this case. Even assuming the book value of St. Joseph's depreciable assets did not equal their fair market value, St. Joseph's cash and cash equivalents were $3.7 million, with total current assets at $29 million. As noted, the consideration for the transaction (Via Christi's assumption of St. Joseph's liabilities) was only $26.1 million. Absent some record evidence to suggest that the current assets were impaired or worth significantly less, it seems purely speculative to remand to determine why St. Joseph would have sold its current assets at a material discount and its depreciable Medicare assets for nothing. As PM A-00-76 explains, "the sales price (assumed liabilities) is allocated first to the cash, cash equivalents, and other current assets," so in situations where the current assets are worth more than the assumed liabilities, "effectively the current assets have been sold, and the fixed assets have been given over at minimal or no cost." PM A-00-76, at 4 (Example 3). In such a situation, "[b]ecause no part of the purchase price was allocated to the fixed assets, a bona fide sale of those assets has not occurred and Medicare would not recognize a loss as a result of the transaction." Id. Regardless of the fair market value of St. Joseph's depreciable assets, the consolidation at issue did not involve the reasonable consideration that a "bona fide sale" would produce, and St. Joseph is not entitled to Medicare reimbursement for a depreciation adjustment.

Id. at 1277 (footnote omitted). See also Lehigh Valley, 253 Fed. Appx. at 196-97 (PRRB appropriately concluded that transaction–in which the buyer assumed Muhlenberg's liabilities of $43,748,442 and paid for the transaction costs of the sale when the book value of the hospital was over $100,000,000 and an accounting firm had valued its fixed and intangible assets at $62,640,000–did not constitute a bona fide sale because the sale price for the assets did not

18

equate to the cash and cash equivalents and it appropriately did not consider the value of promises of future services).

In this case, the Administrator stated that:

> Regarding the consideration for the transfer of SVH's assets, the record shows that SVH claimed assets with a net book value of $124,082,500 which transferred to the VHF pursuant to the assumption of liabilities of $26,581,012 (or approximately 21.42 percent of the total value). This resulted in a difference of $97,501,488 between the value of the assets and the value of the consideration received by SVH in exchange for the assets. Based on these facts, the record does not demonstrate that reasonable consideration was received for the assets.

(A.R. 29.) The Administrator further stated that the fact that the parties did not secure an appraisal prior to the transaction was further indication that the providers were not concerned with receiving reasonable consideration for the depreciable assets and that they did not place the assets for sale on the open market to ascertain their worth, also indicating that there was no good faith bargaining to establish the fair market value of the assets as an ongoing concern before the transaction. (A.R. 30.) Nevertheless, the Administrator noted that:

> Even the SVH's "fair market appraisal"... conducted after the transfer of assets and unverified by the Intermediary, shows a "business enterprise" value of $107,336,000 and individual assets of $77,279,500. While the later figure does not show cash and current assets, this amount alone is far in excess of the liabilities assumed.

(A.R. 29 n.46.)

Similarly, with respect to TMC, the Administrator found that:

> the record shows that TMC claimed assets with a net book value of $191,632,467 which transferred to the VMF pursuant to the assumption of liabilities of $63,488,323 (or approximately 33.18 percent of the total value). This resulted in a difference of $127,874,144 between the value of the assets and the value of the "consideration" received by TMC in exchange for the assets. Based on these facts, the record does not demonstrate that reasonable consideration was received for the assets.

19

(A.R. 29-30.) With respect to the after-the-fact appraisal, the Administrator noted that:

> Even the TMC's "fair market appraisal"... conducted after the transfer of assets and unverified by the Intermediary, shows a "business enterprise" value of $125,387,000 and individual assets of $107,929,000. While the later figure does not show cash and current assets, this amount alone is far in excess of the liabilities assumed.

(A.R. 30 n.49.)

The Secretary's conclusion that the transaction was not a bona fide sale is supported by substantial evidence in the record, including Plaintiff's appraisals. Therefore, it is entitled to deference.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Plaintiffs (Docket No. 16) be denied. It is further recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 20) be granted.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

    Respectfully submitted,

    s/Robert C. Mitchell
    ROBERT C. MITCHELL
    United States Magistrate Judge

Dated: May 23, 2008